EXHIBIT B

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF SUFFOLK**
————————————————————————X

**JUSTIN MATTERA,**

                      **Plaintiff,**

      **-against-**

**WESTHAMPTON BEACH SCHOOL DISTRICT;**
**SUZANNE MENSCH, as President of the Board of**
**Education of the Westhampton Beach School District;**
**CAROLYN PROBST, as Superintendent of the**
**Westhampton Beach School District; CHRISTOPHER**
**HERR, as Principal of the Westhampton Beach High**
**School; CHARISE MILLER, as Principal of the**
**Westhampton Beach Middle School, MARY ANN**
**AMBROSINI, as the Director of Pupil Personnel for the**
**Westhampton Beach School District, and ROBERT**
**FINN, as Director of Guidance and Data Management**
**For the Westhampton Beach School District,**

                    **Defendants.**

————————————————————————X

**Index No.**

**SUMMONS**

**The basis for**
**the venue**
**is the issue arose in**
**Suffolk County.**

TO THE ABOVE-NAMED DEFENDANTS:

    **YOU ARE HEREBY SUMMONED** and required to appear at the SUPREME COURT, COUNTY OF SUFFOLK, ONE COURT STREET, RIVERHEAD, NEW YORK 11901, by serving an answer to the annexed Complaint upon Plaintiff's Attorney, at the address stated below, or if there is no attorney, upon the Plaintiff, at the address stated above, within the time provided by law as noted below, upon your failure to answer, judgment will be taken against you for the relief demanded in the complaint, together with the costs of this action.

Dated: Westhampton Beach, New York
      December 19, 2023

                    Yours, etc.

                    KILLORAN LAW, P.C.

                    X

                    By: Christian Killoran, Esq.
                    Attorney for Plaintiff
                    132-13 Main Street
                    Westhampton Beach, New York 11978
                    (631) 878-8757

Case 2:24-cv-00566-LDH-SIL   Document 1-2   Filed 01/26/24   Page 3 of 29 PageID #: 15

NOTE: The law provides that:

(a) If this summons is served by its delivery to you personally within the County of Suffolk you must answer within 20 days after such service; or

(b) If this summons is served by delivery to any person other than you personally, or is served outside the County of Suffolk or by publication, or by any means other than personal delivery to you within the County of Suffolk you are allowed 30 days after the proof of service thereof is filed with the Clerk of this Court within which to answer.

(c) You are required to file a copy of your answer together with proof of service with the clerk of the district which the action is brought within ten (10) days of service of the answer.

**DEFENDANTS' ADDRESSES**
**340 Mill Road**
**Westhampton Beach, New York 11978**

Case 2:24-cv-00566-LDH-SIL   Document 1-2   Filed 01/26/24   Page 4 of 29 PageID #: 16

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF SUFFOLK**
_____X

JUSTIN MATTERA,

                    Plaintiff,                          Index No.

          -against-

WESTHAMPTON BEACH SCHOOL DISTRICT;
SUZANNE MENSCH, as President of the Board of
Education of the Westhampton Beach School District;
CAROLYN PROBST, as Superintendent of the
Westhampton Beach School District; CHRISTOPHER
HERR, as Principal of the Westhampton Beach High
School; CHARISE MILLER, as Principal of the
Westhampton Beach Middle School, MARY ANN
AMBROSINI, as the Director of Pupil Personnel for the
Westhampton Beach School District, and ROBERT
FINN, as Director of Guidance and Data Management
For the Westhampton Beach School District,

                    Defendants.
_____X

## Verified Complaint

1.      My name is Justin Mattera, and I am the named plaintiff herein.

2.      I am 44 years old.

3.      My present address is 3 Woodcock Lane, Remsenburg, NY 11960.

4.      As a homeowner, I pay federal, state, and town (local) taxes.

5.      My local taxes are largely utilized to pay for the educational services provided by my

local school district.

6.      My local school district (Remsenburg-Speonk Union Free School District) is vested in an

educational contract with the Westhampton Beach School District (Westhampton), wherein

Westhampton provides for the post-elementary education of Remsenburg's residents grades 7-

12.

1

Case 2:24-cv-00566-LDH-SIL   Document 1-2   Filed 01/26/24   Page 5 of 29 PageID #: 17

7.      In 2001, I received a Bachelor's of Science (BS) degree in Psychology from Towson University.

8.      In 2008, I received a Master's degree (MA) in Special Education from Dowling College.

9.      In February 2023, I received a "specialized certification" from the New York State Department of Education, which enables me to teach "special education" in mathematics.[1]

10.     Since 2004, I have been employed as a teacher within Westhampton.

11.     Throughout the duration of my employment, I have scored well on all of my performance assessments.

12.     During the approximate initial 5 years of my employment within Westhampton, I taught "Regents" math (algebra) within a "special class", composed of both 9th and 10th grade students.

13.     A special class is a class entirely composed of disabled students.

14.     Thereafter, and for approximately the last 14 years, I have taught "Regents" math (algebra and/or geometry) within an "integrated co-teaching (ICT)" setting, wherein I have served as the classes' "special education" teacher.

15.     An ICT class is composed of both disabled and non-disabled students and is largely designed to effectuate the most "least restrictive learning environment (LRE)" for disabled students in accord with the Individuals With Disabilities Education Act (IDEA).[2]

16.     My disabled students alternatively have either "504 plans" or "Individualized Education Plans (IEPs)".

---

[1] Eligibility for this certification inherently vests after 3 years of service.
[2] LRE is a doctrine that seeks to integrate disabled students with non-disabled students to the maximum extent appropriate. An ICT class setting is an educational placement option profiled along the "continuum of educational placement options". (See: 8 NYCRR 200.6).

2

Case 2:24-cv-00566-LDH-SIL Document 1-2 Filed 01/26/24 Page 6 of 29 PageID #: 18

17.     504 plans are designed to afford disabled students with educational accommodations and modifications that help such students effectively cope with the effects of their respective disabilities.

18.     Similarly, IEPs are designed to afford disabled students with educational plans and placements designed to address their unique and individualized needs.

19.     Under the (IDEA), as well as under Section 504 of the Rehabilitation Act of 1973 (504), disabled students are entitled to the provision of an "appropriately ambitious" free public education (FAPE).

20.     In approximately 2008, Westhampton began implementing an accelerated math program.

21.     Specifically, in this regard, Westhampton began teaching its "Regents" foundational algebra class at the 8th grade level, as opposed to the conventional 9th grade level.

22.     By implementing an accelerated math program, school districts are able to have their students finish their "Regents" graduating requirements early, which in turn simultaneously enables such students to take "advanced placement (AP) classes" during their latter high school years.

23.     School districts are assessed favorably predicated upon "Regents" graduation rates, as well as school district enrollment rates within AP classes.

24.     During the 2021-2022 and 2022-2023 academic years, New York State was implementing a "Covid Exemption", which provided that any student who scored at least a "50" on a "Regents Exam", but otherwise was receiving a "passing grade", could nevertheless earn "Regents Exam" credit, provided they procured certain tangential administrative approvals.[3]

---

[3] The conventional passing Regents Exam grade is a 65. This Covid Exemption provided a theoretical incentive for the school district to seek the artificial inflation of grades, which of course, cast Westhampton in a better light. Upon information and belief, the students who Westhampton afforded the Covid Exemption to actually never procured the requisite administrative approvals that are supposed to be a part of the exemption process.

Case 2:24-cv-00566-LDH-SIL Document 1-2 Filed 01/26/24 Page 7 of 29 PageID #: 19

25. Since 2012, "Suzanne Mensch" has been the "President" of Westhampton's "Board of Education".

26. Since 2021, "Carolyn Probst" has been the "Superintendent" of Westhampton.

27. Since 2008, "Christopher Herr" has been the "Principal" of Westhampton's high school.

28. Since 2004, "Charisse Miller" has been the "Principal" of Westhampton's middle school.

29. Since 2010, "Mary Ann Ambrosini" has been the "Director of Pupil Personnel" for Westhampton.[4]

30. Since 2008, "Robert Finn" has been the "Director of Guidance and Data Management" for Westhampton.

31. During the academic year of 2021-2022, a colleague of mine, namely Vanessa Tucker, told me that Westhampton had begun pulling certain students out of her class, and alternatively began teaching them within a segregated setting, namely within a newly formed class.[5]

32. Notably, at such time, Vanessa was teaching an ICT math (algebra) class at the 9th grade level, wherein she was co-teaching the class with another colleague of mine, namely Cindy Griffin.[6]

33. Equally notable, Vanessa served as the classes' general education teacher, while Cindy served as the classes' special education teacher.

34. The students who were pulled out of Vanessa's class were those students who were struggling academically.[7]

---

[4] Ms. Ambrosini was not employed by the district between approximately 2017-2019.
[5] The district's directive was conveyed within a meeting called by Mr. Finn with Vanessa. Also, upon information and belief, Mr. Finn met separately with Cindy Griffin and conveyed the same directive.
[6] 9th grade algebra was not on the advanced math program tract.
[7] Upon information and belief, such students were failing.

4

35. As stated, these students began receiving their instruction within a segregated class, wherein Cindy was assigned to teach such students exclusively.

36. Vanessa told me that both she and Cindy felt very uncomfortable and nervous about this dynamic because the creation of the class was violative of the educational placements that were profiled within such students' respective educational plans.[8]

37. Moreover, Vanessa told me that she and Cindy felt additionally uncomfortable and nervous about this dynamic because the teaching and grading procedures being implemented within this segregated class were instructed to be modified.

38. Specifically, in this regard, the segregated students began receiving less rigorous instruction, and their grades and passing levels were commensurately artificially inflated.

39. In light of the foregoing, Vanessa told me that she expressed her concerns to Mr. Finn, who served as Westhampton's "Director of Guidance and Data Management".[9]

40. Vanessa told me that Mr. Finn made it clear to her that the class bi-furcation, segregation, modified instructional rigor and artificial grade inflation strategy was how Westhampton had decided to go about addressing the academic struggles of the segregated students.

41. It was also at this approximate time that I learned that this dynamic was occurring within the middle school as well.

42. Additionally, Westhampton apparently began giving the middle school teacher(s) who had acquiesced to participating in this dynamic extra-pay.[10]

---

[8] A change in placement would require a "Prior Written Notice (PWN)".

[9] Part of Mr. Finn's job is to inform the school district regarding the types of data that is needed to best portray the school district in positive light. As such, Mr. Finn serves in a corollary administrative capacity to implement policies that best portray the school district favorably. In this regard, Mr. Finn basically serves as Westhampton's "Public Relations" officer.

[10] This process of 1/6th pay has been employed by Westhampton to control and manipulate teachers. An analysis of the school district's apportionment of who it apportions extra payments to is illustrative of the school district's nefarious goals. The high school class was an ICT class, so the school district already had a built in person to teach the segregated students.

5

Case 2:24-cv-00566-LDH-SIL   Document 1-2   Filed 01/26/24   Page 9 of 29 PageID #: 21

43.     Vanessa told me that soon after her conversation with Mr. Finn, that Ms. Ambrosini came to her and asked her if they (Vanessa and Cindy) had everything that they needed.

44.     Vanessa then expressed her concern to Ms. Ambrosini that the segregation was inconsistent with the student's IEP directives, but Ms. Ambrosini simply told her and Cindy to tell the parents of the segregated students that they were receiving "parallel teaching".

45.     The class bi-furcation, segregation, modified instructional rigor and artificial grade inflation that was occurring became very distressful to the staff members within the "Math Department".

46.     As such, the Math Department staff began internally expressing our concerns amongst each other.

47.     Notably, I was personally concerned about what was occurring because I knew that I would be inheriting students at the 9th grade level who would not be adequately prepared to learn geometry.

48.     Indeed, successful algebra instruction and mastery is a bridge to successful geometry instruction and mastery.

49.     Westhampton's Math Department has monthly meetings, wherein the staff and administration discuss the general status of the school district's overall program.

50.     At this time, the Math Department's next monthly meeting for the 2021-2022 academic year was scheduled sometime in March of 2022.

51.     In advance of the monthly meeting, the Math Department staff internally discussed how we would be relaying our concerns to the administration.

6

Case 2:24-cv-00566-LDH-SIL Document 1-2 Filed 01/26/24 Page 10 of 29 PageID #: 22

52.     Indeed, the class-bifurcation, segregation, modified instructional rigor, and artificial grade inflation that was occurring was very alarming to all of us, and furthermore profiled as a direct affront to the integrity of our profession at-large.

53.     Moreover, we all recognized that what was occurring was violative of our duties as teachers, as well as our obligations owed to our students and the taxpayers of the community.

54.     As such, leading into the monthly meeting, I had discussed with my peers that we should all speak and express our concerns.

55.     In fact, our collective concern regarding the artificial grade inflation had been growing ever since Mr. Herr and Mr. Finn had previously conveyed a directive or request for our students' grades to be "Juiced Up" a year prior.

56.     At the monthly meeting, the school district officials Mr. Herr, Mr. Finn, and Kerry Pillittier (Assistant High School Principal) all appeared.

57.     At the beginning of the meeting, Mr. Herr asked the staff if we had any comments - but unfortunately everyone remained quiet.

58.     As such, I alone spoke up and addressed the concerns that everyone had.

59.     Mr. Herr, Mr. Finn and Ms. Pillittier all collectively dismissed my concerns.

60.     As such, nothing was done to address what was happening.

61.     Accordingly, I approached my "Union" and expressed my concerns.

62.     My Union representative stated that he would discuss the matter with Superintendent Probst.

63.     Subsequently, my Union representative confirmed that he did meet with Superintendent Probst to discuss these matters.

7

64. In any event, just as I had feared, during the 2022-2023 academic year, I began inheriting students who were foundationally unprepared for my 9th grade geometry class.

65. In fact, the students who were unprepared were the same students who had been segregated into the bifurcated class that was employing the less rigorous instruction and artificial grade inflation.

66. At our monthly Math Department meeting held in the Fall of 2022, both myself and my colleague/co-teacher Tracy DiMarco, both advised Mr. Herr, Mr. Finn, and Ms. Pillittier that the students that we were inheriting did not possess the prerequisite skills to succeed.

67. Mr. Herr's response was "work your magic".

68. During the 2022-2023 academic year, Westhampton nevertheless began repeating its strategy of bi-furcation, segregation, modified instructional rigor, and artificial grade inflation.

69. Based upon my frustration, I expressed my concern to two of the teachers who were involved in facilitating what was happening, namely Erika Coiro and Anne Gassner.

70. Specifically, in this regard, I asked them to confirm what was happening and how the artificial grade inflation could be justified.[11]

71. Erika Coiro responded that the grading policy that was being implemented was not in their (her or Anne's) discretion, but rather was directed by the administration, and thus that my inquiries should directed to Mr. Finn.

72. In light of the foregoing, I again went to my Union to express my concerns, but I was told, yet again, that my claims would be hard to prove and that the school district had lots of power.

---

[11] Examples of the grade inflation that was occurring were manifest in student's grades rising from 67 and 68 within the first 2 quarters, and then dramatically increasing to a 95 after the segregation occurred. In addition, students who were averaging below 65 nevertheless received "passing" grades.

8

73.    The Math Department's next monthly meeting for the 2022-2023 academic year was scheduled to occur in the Spring of 2023.

74.    At the meeting, I again expressed my concerns regarding what was happening.

75.    This time however, my colleague, Tracy DiMarco, also joined me in raising our concerns.[12]

76.    Notably, the same school district officials who had appeared at the prior year's annual meeting appeared again - namely Mr. Herr, Mr. Finn and Ms. Pillittier.

77.    Unfortunately, the concerns that Tracy and I expressed were, yet again, greeted with the same degree of dismissiveness as the year prior.[13]

78.    Mr. Herr specifically stated that he was not going to tell Ms. Miller how to run her building.

79.    Ms. Miller was the Principal of Westhampton's middle school, wherein the class bi-furcation, segregation, modified instructional rigor, and artificial grade inflation was occurring since the 2021-2002 academic year.

80.    As the 2022-2023 academic year was winding down, I received an email from Mr. Herr to come see him for purposes of reviewing the next year's (2023-2024) academic schedule and assignments.

81.    At the meeting, Mr. Herr stated that he had something different planned for me for the next academic year.

82.    Specifically, in this regard, Mr. Herr, stated (in a sneering manner) that he was implementing "a little shake-up".

---

[12] Tracy would also go on to be retaliated against in similar fashion to myself.

[13] Incredulously, Tracy was also removed from teaching a "Regents" class for the 2023-2024 academic year, and alternatively was assigned to the least desirable Math Class available. Even worse, Tracy was replaced by a non-tenured teacher, namely Alyssia Tempera.

9

Case 2:24-cv-00566-LDH-SIL   Document 1-2   Filed 01/26/24   Page 13 of 29 PageID #: 25

83.    Mr. Herr then told me that I would no longer be teaching the ICT geometry class, or any "Regents" math class for that matter, akin to which I had been teaching for the past 19 years, and that I would alternatively be teaching 4 "resource room" periods, as well as a "non-Regents" special geometry class.[14]

84.    Notably, "Resource Room" instruction simply provides supplementary academic support instruction and is not a "content-area" class.

85.    Further, "Resource Room" is a non-graded instructional period and is comprised of comparatively very little students.

86.    Similarly, the "non-Regents" special geometry class is also comprised of comparatively very little students.

87.    Further, an assignment to four (4) "Resource Room" periods, as an overall percentage of a teacher's employment schedule, is highly unusual.

88.    I asked Mr. Herr why he was making this change and he simply repeated – again in a sneering way – that he was "just shaking things up".

89.    I further inquired of Mr. Herr for a rationale for his decision, but, yet again, his response was simply the same – that he was "just shaking things up".

90.    I then expressed to Mr. Herr that I thought that his action was retaliatory.

91.    Mr. Herr then responded with an appalled look on his face and said "Justin, I like you".

92.    I responded by stating that it was very unfortunate how the administration was choosing to operate.[15]

---

[14] Teaching four (4) Resoure Room periods is highly unusual. Also, special classes have a nominal amount of students.

[15] In June 2017 a district-wide survey was undertaken. The overwhelming conclusion that emanated from the survey was that the school district was suffering from very low morale, specifically due to Mr. Herr's mis-management.

10

Case 2:24-cv-00566-LDH-SIL Document 1-2 Filed 01/26/24 Page 14 of 29 PageID #: 26

93. Shortly after my meeting with Mr. Herr, a colleague of mine, namely Christine Minnear, who is a guidance counselor within the school district, called me into her office and said that she had noticed a scheduling change that she wanted to discuss with me.

94. Christine asked me if I knew what was happening with my schedule, and I said that I did.

95. I then told Christine what Mr. Herr had informed me, and how my 19 year old "Regents" assignment was now being taken away from me, and moreover how I was now being effectively "side-lined" by virtue of being stripped of effectively teaching any "Regents" class, or impacting students' grades.

96. Christine responded to me by telling me that such re-assignment wasn't actually the worst of it, as the administration had actually initially planned on implementing an even worse retaliatory re-assignment.

97. Specifically, in this regard, Christine told me that I could not tell anyone, but that the school district had originally planned to transfer me to an ICT English and Social studies class.

98. Notably, I have never taught English or Social Studies in my life.

99. In any event, upon seeing the dramatic change, and recognizing how such change would undoubtfully impart negative consequences, Christine brought her concerns to Mr. Finn.

100. Christine explained how she had discussed with Mr. Finn how parents would likely be calling her about how their children's educational instruction was being negatively impacted.

101. Christine said that when she asked Mr. Finn about the dramatic change, and whether it was a mistake, that Mr. Finn simply smiled and said "no, it's not a mistake."

102. Because of her continuing concern, Christine then told me that she then went to see Mr. Herr to voice her concerns.

11

Case 2:24-cv-00566-LDH-SIL   Document 1-2   Filed 01/26/24   Page 15 of 29 PageID #: 27

103.    Christine told me that Mr. Herr told her that it would not be an issue and that the newly assigned teacher would be capable of facilitating differentiated instruction.

104.    Further, Christine told me that Mr. Herr stated that he needed to break me away from my co-teacher, Tracy Dimarco, and moreover, that he wanted to separate both of us (Tracy and I) from "Regents" instruction.

105.    In fact, Tracy would also face retaliation from the administration by also being similarly stripped of her teaching duties, and being re-assigned to what is considered by many of my colleagues to be the least desirable teaching class available.

106.    Worse, Tracy was replaced by a non-tenured teacher, who the administration could obviously coerce to play proverbial "ball".

107.    Finally, Christine explained that Mr. Herr had told her that "Justin is too rigid".[16]

108.    As Christine appreciated the obvious problems that this dramatic change would impart, she then brought her concerns to Ms. Ambrosini.

109.    As Christine explained to me, it was only at this juncture – in fact, the very next day, wherein the scope of my intended staffing change was revised to be an assignment to four (4) "Resource Room" periods and a "non-Regents" geometry class, as opposed to an ICT English and Social Studies class.

110.    Incredulously, at this time, I also learned from Christine that my replacement teacher would be one of the teachers who had been actively participating within the school district's class bi-furcation, segregation, modified instructional rigor, and artificial grade inflation strategy, namely Cindy Griffin.

---

[16] By effectively demoting Tracy and I, the defendants were clearly enacting retaliation upon us. Further, by replacing us with teachers willing to cooperate with their plan, the defendants were establishing the landscape for the perpetuation of their strategy.

12

111.    Based upon the situation, I, yet again, went to my Union to express my concerns.

112.    Yet again however, I was nevertheless told that the school district has all the power and that my claims would be difficult to pursue.

113.    At this point, I told my Union that I nevertheless wanted to pursue the issue.

114.    As such, my Union offered to have me meet with a "labor relation specialist" after the 2022-2023 school year concluded.

115.    While I accepted the Union's offer, I also asked for a meeting with Ms. Ambrosini.

116.    On June 16, 2023, I met with Ms. Ambrosini and discussed my concerns.

117.    At the meeting, I expressed my concerns and reiterated how wrong the school district's actions were.

118.    I reminded Ms. Ambrosini how the school district's own guest speaker, who had recently spoken at our "Superintendent's Conference Day", had emphasized how critical it was to not just pass students on without them acquiring the pre-requisite skills necessary to have success in the ensuing course.

119.    I also cited the New York State Department of Education web-site which emphasizes the importance of how rigorous algebra instruction was a necessary bridge to successful geometry understanding.

120.    Ms. Ambrosini remarkably responded by asking me why I thought grades should even matter when considering passing students from grade-to-grade.

121.    Ms. Ambrosini also asked me why I felt that is was better to fail students rather than to hold them accountable to passing assessment standards.

122.    I explained to Ms. Ambrosini how it was essential to challenge students to meet the grade-level content standards and to moreover prepare them to pass standardized testing, particularly so they can succeed in the next sequential math course.

123.    I further explained to Ms. Ambrosini that when standards are reduced for students, that several negative effects can be observed, both in the immediate context and over the longer term; and moreover, that the impacts can be wide-spread, including academic, psychological, social, and even economic effects.

124.    Based upon my knowledge, the negative effects of reducing educational standards include:

*Decreased academic rigor*: Lowering standards often means students are not exposed to as rigorous and challenging a curriculum, which may leave them unprepared for higher-level education or professional work;

*Skill gaps*: Students must be held to a high standard to graduate without gaps in fundamental skills, whether those are in reading, mathematics, or critical thinking;

*Decreased motivation*: When students perceive that less effort is needed to succeed, they may become less motivated to put in the effort, leading to a culture of complacency;

*Inequity in education*: When standards are reduced, it can exacebate educational inequities. Students in environments with high standards may receive a vastly different education than those with lower standards;

*Inaccurate self-assessment*: Students might believe they perform at an optimal level when underperforming relative to more rigorous standards. This misperception can lead to overconfidence in abilities and challenges later when faced with harder tasks;

*Economic implications*: If many students graduate without the necessary skills to contribute to the workforce, it can have long-term implications for a community's or nation's economic health;

*Higher educational challenges*: Students who proceed to higher education institutions might need help with the increased demands and expectations if they come from a background where educational standards were lowered;

*\* Social implications:* *Lowering standards might also lead to societal implications, where the value of a diploma or degree might be diluted, and this could affect how employers, institutions, or peers view educational achievements;*

*\* Depreciating teacher morale:* *Teachers who are passionate about their subjects and student growth might feel constrained or demotivated if forced to teach to a lower standard, and this could lead to decreased job satisfaction and even burnout;*

*\* Impact on high-achieving students:* *Lowered standards can be particularly detrimental to students capable of more challenging work, as such students may feel unchallenged or bored, leading to disengagement from school altogether, and*

*\* Unprepared for real-world challenges:* *Schools are supposed to prepare students for the real world, and part of that is teaching resilience, perseverance, and problem-solving, and students might only develop these essential life skills if standards are high.*

125. I also explained to Ms. Ambrosini how the school district's accelerated math program afforded students with the opportunity to retake the classes if necessary, and thus that there was no "rush" to artificially pass students.

126. I further explained to Ms. Ambrosini that what was going on within the school district was disastrous, and that the staff was suffering from low morale due to a dynamic wherein much of the staff was being pressured to inflate grades, while the rest of the staff was feeling the pressure of being re-assigned for not doing so.

127. Ms. Ambrosini then pivoted her commentary to talking about the psychological harms impacted upon students when they fail.

128. In response, I then brought up a story to Ms. Ambrosini regarding one of my past students who had been segregated due to her struggles, and how she had relayed to me how she passed the class, but how she really didn't.

129. I then asked Ms. Ambrosini about how that dynamic and realization impacted the student psychologically.

130. Ms. Ambrosini had no answer to my question and so she just stared blankly at me.

Case 2:24-cv-00566-LDH-SIL   Document 1-2   Filed 01/26/24   Page 19 of 29 PageID #: 31

131.    I also asked Ms. Ambrosini who made the decisions regarding staffing assignments.

132.    Towards this end, Ms. Ambrosini responded by stating that Mr. Herr and Superintendent Probst were responsible for making those decisions.

133.    Shortly thereafter, the meeting that my Union had scheduled with the labor specialist occurred.

134.    At such meeting, the labor specialist informed me that the Union was there to support me, but that my complaint was going to be difficult to prove.

135.    Based upon the foregoing, I reached out to Suzanne Mensch (President of the Board of Education) to discuss my concerns.

136.    I told Ms. Mensch that I wanted to speak privately with the Board of Education.

137.    I further told Ms. Mensch that I had a statement that I was prepared to read, and that I would be happy to read it to her.

138.    Ms. Mensch said ok, and so I did.

139.    After hearing my statement, Ms. Mensch said that she did not know that much of what I was explaining was occurring, and that she would need to speak with the school district's counsel about my request to meet with the Board of Education, but that she would get back to me.

140.    Eventually, Ms. Mensch did get back to me, and stated that while she would accommodate a closed meeting with the Board of Education, that Superintendent Probst would also need to be present.[17]

141.    My appearance before the Board of Education was scheduled for July 11, 2023.

---

[17] Superintendent Probst was hired during Ms. Mensch's tenure as President of the Board of Education.

16

Case 2:24-cv-00566-LDH-SIL   Document 1-2   Filed 01/26/24   Page 20 of 29 PageID #: 32

142.    I attended the meeting with my fiancée and the Vice President of my Union – Michael Amy.

143.    At the meeting, I read my prepared statement, which reiterated all of my concerns about what was happening within the school district.

144.    After I finished speaking, Ms. Mensch said "thank you for sharing".

145.    At that point, Superintendent Probst responded that she was going to "speak off the cuff" about my concerns.

146.    After saying as much however, Ms. Probst then began regurgitating an obviously prepared statement that was clearly anything but "off the cuff", replete with reciting alleged numerical statistics regarding how failing algebra students led to students suffering from psychological issues, receding graduation rates, and future incarceration rates.

147.    Remarkably, at no time however did Superintendent Probst deny or contest that class bi-furcation, segregation, modified instructional rigor and artificial grade inflation was occurring.

148.    In any event, I would note that all of Superintendent Probst's foundational arguments are not actually supported by the relevant scientific studies attendant to the effects of lowering educational standards.

149.    In fact, based upon my knowledge, the scientific research runs opposite to her claims, including the following relevant studies:

*Decreased academic rigor and skill gaps*: The National Mathematics Advisory Panel (2008) indicated that a rigorous high school curriculum predicts success in college mathematics, and that a less rigorous curriculum could create skill gaps that hinder success in advanced studies;

*Decreased motivation*: C.S. Dweck's research on mindset highlights that students' beliefs about their abilities can shape their motivation and achievement and that lower standards inadvertently promotes a fixed mindset, reducing effort and motivation. (See: "Mindset: The new psychology of success", Psychology Journal, Vol. 7, No. 9, 2016, Random House);

17

*Inequity in Education*: A report by The Education Trust (2013) found that schools with high concentrations of low-income and minority students often have less rigorous curricula, contributing to achievement gaps;

*Inaccurate self-assessment*: The "Dunning-Kruger Effect", documented in numerous studies, suggests that individuals with low ability at a task often overestimate their ability and that lowering standards might exacerbate this effect;

*Economic implications*: The Program for International Student Assessment (PISA) regularly assesses the skills of 15-year-olds in various countries, and the countries with lower performance on these assessments often see a connection between their scores and economic outcomes;

*Higher education challenges*: D.T. Conley's research emphasizes that rigorous high school standards better prepare students for the demands of college. (See: Redefining college readiness. Educational Policy Improvement Center);

*Depreciating Teacher Morale*: R. Ingersoll's research (2001) has shown that a lack of professional autonomy and decision-making power can contribute to teacher turn-over, which curricular and standard decisions can influence (See: Teacher Turnover and Teacher Shortages: An Organizational Analysis");

*Impact on high -achieving students*: The National Association for Gifted Children (NAGC) frequently emphasizes the importance of challenging curricula for high-achieving students to prevent underachievement and ensured continued growth;

*Unprepared for real-world challenges*: Act (2006) report highlighted the disconnect between high school and college/work readiness, suggesting that many students need to be adequately prepared for life after high-school when standards aren't aligned with post-secondary demands. (See: The Forgotten Middle – Ensuring that All Students Are on Target for College and Career Readiness before High School).

150.    In any event, after Superintendent Probst finished speaking, I felt compelled to offer a genuine "off the cuff" assessment of her comments, and so I relayed to the Board of Education a story involving a former student of mine that I had just recently encountered at the beach.

151.    In this regard, I explained to the Board of Education that this was a student who had struggled in my class, but that I had nevertheless continued to challenge.

18

152.    I recounted to the Board of Education that when I saw him how we celebrated not only the fact of how he had worked hard and passed the class, but moreover how he went on to pass the "Regents" exam as well.[18]

153.    I told the Board of Education of how both the student and his parents had smiled and celebrated in knowing that he had genuinely achieved something.

154.    After telling my story to the Board of Education, I indicated that I had nothing further to say, other than to request that the Board of Education undertake an investigation regarding the legitimacy of my concerns.

155.    I then left the meeting.

156.    Subsequently, on July 12, 2023, I received an email from Superintendent Probst which stated that she was hoping to follow up upon our discussion at the Board of Education meeting.

157.    Upon believing that Superintendent Probst may have actually decided to take action upon what was occurring within the school district, I accepted her invitation.

158.    Accordingly, we met on August 2, 2023.

159.    At the meeting however, Superintendent Probst did not address any of my concerns, but rather stated to me that she was simply there to listen to anything additional that I had to say.

160.    As such, I expressed to Superintendent Probst that I was not there to discuss whether or not the school district's actions were wrong; but rather, that I was there to obtain a status update regarding the investigation that I had requested.

161.    I told Superintendent Probst that I really didn't want to re-argue the merits of my concerns, as I knew what was occurring within the school district was wrong.

---

[18] The point is that without rigorous instruction, although a student may be able to pass a class via being afforded artificial grade inflation, he/she could not however pass a "Regents Exam".

19

162.    Superintendent Probst then commented that she did not envision that the school district's practices would need to be continued the next year.[19]

163.    I then expressed to Superintendent Probst that while that was a good thing, that the school district's retaliatory treatment of me nevertheless needed to be addressed.

164.    In this regard, Superintendent Probst then stated that my re-assignment was simply routine practice.

165.    I then asked Superintendent Probst if there was any update upon the investigation that I had requested.

166.    Superintendent Probst responded by stating that there was not, and moreover that there would be no further investigation from her or the Board of Education.

167.    In order to confirm the validity of Superintendent Probst's statements, I then reached out to Ms. Mensch on August 3, 2023.

168.    Ms. Mensch responded that Superintendent Probst was correct and that there would be no further investigation.

169.    As a result of the defendants' actions, I have been suffering significant emotional, physical, and psychological trauma.

170.    As a further result of the defendants' actions, I have now begun therapy.

171.    I have spent over 19 years working diligently on my profession, so that I could be the most effective math teacher as possible, and to impart the most benefit as possible upon my students and my community at-large.

172.    Over the years, my students have routinely scored relatively superior on their respective "Regents" scores, as compared to other students within Westhampton.

---

[19] I again was shocked that there was absolutely no denial regarding what was happening within the school district.

20

Case 2:24-cv-00566-LDH-SIL   Document 1-2   Filed 01/26/24   Page 24 of 29 PageID #: 36

173. In fact, in 2021-2022 four (4) of my and Tracy's students scored "100" on the "Regents" exam – a feat that I've never heard of being accomplished before.

174. I would like to think that so many of my students and their families have appreciated my efforts, as they have pursued my tutoring services independently.

175. The actions undertaken by the defendants haven't just hurt me – they have hurt our students and their families, my colleagues, my profession at-large, and our entire community.

176. Since I filed my Notice of Claim, I have continued to receive slights from the administration.

177. I am not the only person to suffer retaliation from the administration and I have since learned that my Union is aware of other instances.[20]

*1st Cause of Action: Violation of New York Labor Law, Section 740 (Retaliation)*

178. I re-assert the statements set forth within paragraphs 1-177 herein.

179. New York's Labor Law, Section 740 protects employees against retaliation committed by their employers.

180. As indicated herein, I voiced my objections regarding the illegal and/or wrongful conduct that was being committed by the defendants.

181. Again, the defendants' actions were illegal and/or wrongful because the defendants' conduct violated the Individuals With Disabilities Education Act, Section 504 of the Rehabilitation Act of 1973, 42 USC 1983, as well as the defendants' collective obligation to honor their fiduciary and professional obligation to teach students grade-level content standards evaluated against appropriate state assessment criteria.

---

[20] Carrie Bender, who is a Union representative and teacher, has requested to be deposed for purposes of shedding light on the defendants' treatment of me and others.

21

182.    As a result of my objections, the defendants retaliated against me by changing my job assignment, and placing me within a setting wherein I could no longer affect the instruction or grading of my students.

183.    In addition, the defendants have continued their acts of retaliation against me, since I filed my Notice of Claim in other ways.

184.    Moreover, by effectuating my re-assignment, the defendants positioned themselves to perpetuate their wrongful conduct in the future unimpeded.

185.    I respectfully submit that the defendants' actions have been pre-meditated, malicious, and self-serving.

*2nd Cause of Action: Violation of the Americans With Disabilities Act (Interference and/or Retaliation)*

186.    I re-assert the statements set forth within paragraphs 1-185.

187.    The ADA protects people who are retaliated against for advocating for the rights of the disabled.

188.    Inter-alia, I voiced my objections regarding the defendants' strategy of class bifurcation, segregation, modified instructional vigor, and artificial grade inflation because such strategies directly undermine the rights of disabled students not to be discriminated against, and to be treated equally, and to receive an "appropriately ambitious" free and appropriate education (FAPE).

189.    The defendants' actions were self-serving, but moreover were implemented at the direct expense of the students who were segregated.

190.    I was retaliated against for voicing my objections to the defendants' conduct.

*3rd Cause of Action: Violation of Section 504 of the Rehabilitation Act of 1973 (Interference and/or Retaliation)*

22

Case 2:24-cv-00566-LDH-SIL   Document 1-2   Filed 01/26/24   Page 26 of 29 PageID #: 38

191.    I re-assert the statements set forth within paragraphs 1-190.

192.    Section 504 of the Rehabilitation Act of 1973 protects people who are retaliated against for advocating for the rights of the disabled.

193.    Inter-alia, I voiced my objections regarding the defendants' strategy of class bifurcation, segregation, modified instructional vigor, and artificial grade inflation because such strategies directly undermined the rights of the disabled students in my class to receive an "appropriately ambitious" free and appropriate education (FAPE).

194.    The defendants' actions were self-serving, but moreover were effectuated at the direct expense of many of my disabled students' rights to a FAPE.

195.    I was retaliated against for voicing my objections to the defendants' conduct.

[4th] *Cause of Action: Municipal Tax Payer Action, General Municipal Law – Section 51*

196.    I re-assert the statements set forth within paragraphs 1-195 herein.

197.    As a resident tax payer, my local taxes are largely allocated towards supporting the defendant school district's operations.

198.    By extension, my taxes are largely apportioned towards supporting the academic welfare of the students within the defendant school district.

199.    By further extension, my taxes are largely apportioned towards ensuring that future generations of students are able to succeed and impact society at-large in a successful and competitive way.

200.    Additionally, because the performance of school districts is largely linked to the value of its surrounding real estate, the performance of the defendant school district largely impacts the value of the real estate within the community of tax payer's at-large.

23

Case 2:24-cv-00566-LDH-SIL Document 1-2 Filed 01/26/24 Page 27 of 29 PageID #: 39

201. I respectfully submit that the actions undertaken by the defendants undermines the value of the education being provided by the defendant school district, and thus by extension the value of real estate within the tax payer community at-large.

202. I respectfully submit that the actions undertaken by the defendants undermines the value of the education being received by the students within the community at-large, and thus by extension, the welfare of society at-large.

*5th Cause of Action: 42 USC 1983*

203. I re-assert the statements set forth within paragraphs 1-202 herein.

204. As a United States Citizen, I am entitled to the constitutional protections of free speech and due process.

205. The defendants all profile as acting under the color of government because Westhampton is a public school district and the individually named defendants are school officials therein.

206. By asserting my concerns regarding the class bifurcation, segregation, modified instructional vigor and artificial grade inflation that was occurring within the defendant school district, I was engaging in protected speech.

207. Specifically, in this regard, I was speaking out against the defendants' practices that were of clear and significant public concern.

208. The defendants retaliated against me for engaging in such protected speech.

209. Further, the defendants retaliated against me without affording me any legitimate due process or explanation.

210. The reason for the defendants' retaliation was that my concerns undermined the defendants' wrongful strategy to artificially increase graduation rates, grades, and students' involvement within AP classes, and to moreover portray the defendant school district in an

24

Case 2:24-cv-00566-LDH-SIL   Document 1-2   Filed 01/26/24   Page 28 of 29 PageID #: 40

artificially positive light, as well as to insulate the school district officials from negative job assessments.

211.    Another reason for the defendants' retaliation was to chill further dissent from myself, as well as from the Westhampton teaching staff at-large.

   **WHEREFORE**, I respectfully request the Court to affirm the defendants' collective violations of New York's Labor Law - Section 740, the Americans With Disabilities Act (ADA), Section 504 of the Rehabilitation Act of 1973 (504), General Municipal Law - Section 51, and 42 USC 1983 (1983), and thus to award all applicable compensatory and punitive damages to be subsequently determined, as well as to issue any other equitable relief that the Court deems just and proper.

Dated: Westhampton Beach, New York
       December 19, 2023

x. _____
       Justin Mattera, Plaintiff

25

# VERIFICATION

STATE OF NEW YORK          )
                           ) ss:
COUNTY OF SUFFOLK          )


      JUSTIN MATTERA, Plaintiff herein being duly sworn, deposes and says that he has read the

foregoing COMPLAINT; deponent knows its content and knows that it is true to the best of deponent's

knowledge, except as to those matters stated to be upon information and belief, and as to those matters

deponent believes them to be true.

                                     JUSTIN MATTERA

Sworn to before me this
19th day of December 19, 2023

NOTARY PUBLIC

ANDREA SICILIANO
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01SI6044574
Qualified in Suffolk County
Commission Expires July 10, 20__

26