UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JUSTIN MATTERA,

               Plaintiff,

     -against-

WESTHAMPTON BEACH SCHOOL DISTRICT,
SUZANNE MENSCH, CAROLYN PROBST,
CHRISTOPHER HERR, CHARISE MILLER,
MARY ANN AMBROSINI, ROBERT FINN,

              Defendants.

**MEMORANDUM AND ORDER**
24-cv-00566-LDH-SIL

---

LASHANN DEARCY HALL, United States District Judge:

Justin Mattera ("Plaintiff") brings the instant action against Westhampton Beach School District (the "District"), and Suzanne Mensch, Carolyn Probst, Christopher Herr, Charise Miller, Mary Ann Ambrosini, and Robert Finn in their official capacities (collectively, the "Defendants"), asserting violations of the Americans with Disabilities Act (the "ADA"), interference and retaliation under the Rehabilitation Act of 1973, 42 U.S. 1983, and retaliation under the New York Labor Law, New York Civil Service Law, and general municipal law. (Am. Compl., ECF No. 19–2.) Defendants move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the amended complaint in its entirety.

## BACKGROUND[1]

Since 2004, Plaintiff has been employed as a teacher within the District. (*Id.* ¶ 10.) During the "approximate initial five years" of Plaintiff's employment with the District, Plaintiff

---

[1] The following facts are taken from the Complaint and are assumed to be true for the purpose of this memorandum and order, unless otherwise indicated.

taught "Regents"[2] mathematics to a class comprised of 9th and 10th grade students with disabilities (a "Special Class"). (*Id.* ¶¶ 12–13.) During the fourteen years that followed, Plaintiff taught "Regents" mathematics to students with disabilities in a class consisting of students with and without disabilities (an "Integrated Class"). (*Id.* ¶¶ 14–15.) In 2008, Plaintiff obtained a master's degree in special education. (*Id.* ¶ 8.) In 2023, Plaintiff received a "specialized certification" from the New York State Department of Education to teach "special education" in mathematics. (*Id.* ¶ 9.)

Students with disabilities within the District have educational plans tailored to address their individual needs and respective disabilities. (*see id.* ¶¶ 16-18.) Some students with disabilities have educational plans that require their teaching in Integrated Classes. (*see id.* ¶ 35-36.) Integrated Classes are designed to provide the "least restrictive learning environment" for students with disabilities, in accordance with the Individuals With Disabilities Education Act (IDEA). (*Id.* ¶ 15.) "Prior Written Notice" is required to make modifications to the educational plans of students with disabilities. (*Id.* ¶ 36 n.8.)

During the 2021-2022 academic year, the District began removing 9th grade students who were struggling academically from an Integrated Class to a Special Class (the "Practice"). (*see id.* ¶¶ 31-35.) Under the Practice, the students in this newly formed Special Class began receiving less rigorous instruction and their grades and passing levels were artificially inflated. (*Id.* ¶¶ 37-38.) Plaintiff learned that this Practice also occurred at the middle school in the District, and participating teachers were provided with additional compensation. (*Id.* ¶¶ 41-42.)

---

[2] "Regents" refers to certain graduation requirements that students in the District are required to satisfy. (*See Am. Compl.* ¶ 22.) Notably, the Amended Complaint indicated that "[s]chool districts are assessed favorably predicated upon "Regents" graduation rate[.]" (*Id.* ¶ 23.)

In March 2022, staff within the District's math department held their scheduled meeting with the District's administration, including Defendants Kerry Pillittier, Assistant high school Principal; Christopher Herr, Principal of the District's high school; and Robert Finn, Director of Guidance and Data Management for the District (the "District Administrators"). (*see id.* ¶¶ 49-50, 56.) At this meeting, Plaintiff raised concerns about the Practice. (*Id.* ¶¶ 50, 54, 58.) The District Administrators dismissed Plaintiff's concerns. (*see id.* ¶ 59.) Plaintiff, then, raised his concerns about the Practice with his Union, who met with Defendant Probst for further discussion. (*see id.* ¶¶ 61, 63.)

In the following 2022-2023 academic year, Plaintiff inherited students who had been subject to the Practice. (*see id.* ¶ 64.) Plaintiff found these students to be unprepared for his 9th grade mathematics class. (*Id.* ¶ 64-65.) At the fall 2022 Math Department meeting, Plaintiff and one of his colleagues raised concerns to the District Administrators about the students' academic unpreparedness. (*Id.* ¶ 66.) District Administrators dismissed their concerns. (*see id.* ¶ 67.) The District continued the Practice throughout the 2022-2023 academic year. (*Id.* ¶ 68.) Plaintiff again expressed concerns about the Practice to his Union who informed him that the District had "lots of power." (*Id.* ¶ 72.) At the spring 2023 Math Department meeting, Plaintiff and one of his colleagues again raised concerns about the Practice. (*Id.* ¶¶ 73-75.) The District Administrators again dismissed Plaintiff's concerns. (*Id.* ¶¶ 76-78.)

Towards the end of the 2022-2023 academic year Plaintiff received a meeting request from Christopher Herr, Principal of the District's high school. (*Id.* ¶ 80.) During the meeting, Herr informed Plaintiff, "in a sneering manner[,]" that he would no longer be teaching the Integrated Class for mathematics or any class akin to that which he has been teaching for the past 19 years. (*Id.* ¶¶ 82-83.) Herr informed Plaintiff that he would instead be teaching four

3

"resource room" periods and a "non-Regents" special mathematics class. (*Id.* ¶ 83.) "Resource room" periods are non-graded instruction that only provide supplementary academic support and are not content-based classes. (*Id.* ¶¶ 84-85.) An assignment to four "resource room" periods is a highly unusual percentage of a teacher's employment schedule. (*Id.* ¶ 87.) When Plaintiff asked Herr what prompted the change in his teaching schedule, he informed Plaintiff that he was "just shaking things up[.]" (*Id.* ¶ 88.) However, Herr denied Plaintiff's accusation that the change was retaliatory. (*see id.* ¶¶ 90-91.) Plaintiff learned from a colleague that the District had "initially planned on implementing an even worse retaliatory re-assignment" for Plaintiff, including reassignment to Integrated Classes of English and social studies, which Plaintiff had no experience teaching. (*see id.* ¶¶ 93-98.) This colleague also informed Plaintiff that Herr stated he wanted to "break" Plaintiff away from the colleague who similarly raised concerns about the Practice at the fall 2022 Math Department meeting. (*Id.* ¶ 104.) The other colleague who raised similar concerns was "similarly stripped of her teaching duties[.]" (*Id.* ¶ 105.)

Sometime after Plaintiff's meeting with Herr, Plaintiff once again complained about the Practice to his Union and was informed that the "[D]istrict has all the power and that [his] claims would be difficult to pursue." (*Id.* ¶ 112.) Nevertheless, Plaintiff met with Defendant Mary Ann Ambrosini, Director of the Pupil Personnel for the District, to voice his concerns about his re-assignment and the Practice. (*Id.* ¶¶ 116-118.) During this meeting, Ambrosini informed Plaintiff that staffing assignments were determined by Defendants Herr and Probst. (*Id.* ¶¶ 131-132.) Subsequently, Plaintiff raised his concerns with the District's Board of Education (the "BOE") in a meeting on July 11, 2023, where Defendant Suzanne Mensch, President of the Board, and Defendant Probst were present. (*Id.* ¶¶ 135-141.) At the meeting, Plaintiff requested that the BOE undertake an investigation into his "concerns[.]" (*Id.* ¶¶ 143, 154.) The next day,

4

Defendant Superintendent Probst contacted Plaintiff to "follow up on [their] discussion," and Plaintiff met with Probst on August 2, 2023. (*Id.* ¶¶ 156-158.) At the meeting, Probst informed Plaintiff that the Practice would not "need to continue[] the next [academic] year" (*Id.* ¶ 162); Plaintiff's re-assignment was not retaliatory (*Id.* ¶¶ 163-164); and that no further investigation would be conducted into Plaintiff's concerns (*Id.* ¶¶ 165-166). As a result of Defendants' actions, Plaintiff alleges to have suffered significant emotional, physical, and psychological trauma and has begun therapy. (*Id.* ¶¶ 169-170).

## STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of a defendant's liability for the alleged misconduct. *Id.* (citation omitted). Although this standard requires more than a "sheer possibility" of a defendant's liability, *id.*, "[i]t is not the Court's function to weigh the evidence that might be presented at a trial" on a motion to dismiss. *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999). Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true." *Id.* (citations omitted).

Moreover, where, as here, a plaintiff is proceeding pro se, their pleadings "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)). A pro se complaint, "however inartfully pleaded, must be

held to less stringent standards than formal pleadings drafted by lawyers." *Boykin v. KeyCorp*, 521 F.3d 202, 213–14 (2d Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

## DISCUSSION

### I.   Federal Claims[3]

#### 1.   Violation of the Americans with Disabilities Act

##### A.   Interference

Under the ADA, "[i]t shall be unlawful to . . . interfere with any individual in the exercise or enjoyment of, or on account of his . . . having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."  42 U.S.C. § 12203(b). "Neither the Supreme Court nor the Second Circuit has yet outlined a legal test for an interference claim under the ADA."  *Colletta v. Northwell Health,* No. 17-CV-6652, 2019 WL 7598666, at *6 (E.D.N.Y. Aug. 19, 2019) (citation omitted).  "[C]ase law interpreting [the statute] is sparse, but the plain words of the statute . . bar[] interference against a person who has exercised his rights under the ADA." *Id.* (first alteration in original) (citing *E.E.O.C. v. Day & Zimmerman NPS, Inc.*, 265 F. Supp. 3d 179, 204 (D. Conn. 2017)).  "[C]ourts have noted that the ADA's anti-interference provision is similar to a provision in the National Labor Relations Act, 29 U.S.C. § 158, and that interpretations of the NLRA can serve as a useful guide to interpreting similar language in the ADA, as both are part of a wider statutory scheme to protect employees in the workplace nationwide." *Id.* (citation omitted).  "The Second Circuit has found that an employer's conduct violates the NLRA's prohibition on interference if, under all the existing

---

[3] Defendants quizzically argues that Plaintiff's claim for "associational discrimination" under the ADA fails for lack of standing.  (Defs.' Mem. L. Supp. Mot. Dismiss ("Defs.' Mem.") at 11-12, ECF No. 19-3.)  However, the Court finds no such claim in the Complaint.  (Am. Compl.)  Instead, the only claims that Plaintiff brings against Defendants, pursuant to the ADA, are for "interference and/or retaliation[.]"  (Am. Compl. ¶¶ 186-190).

circumstances, the conduct has a reasonable tendency to coerce or intimidate employees, regardless of whether they are actually coerced." *Id.* (citation omitted). "This is an objective test that does not turn on whether any of the affected employees were actually deterred from exercising their rights." *Id.* (citation omitted).

Here, the contours of Plaintiff's claim that Defendants violated the interference provision of the ADA are unclear.  Plaintiff seems to insinuate that Defendants' alleged retaliation against him for advocating for the educational opportunities of students with disabilities somehow interferes with his students' exercise of the rights afforded to them under the ADA.  (*See* Am. Compl. ¶¶ 187-190 ("[D]efendants' strategy of class bifurcation, segregation, modified instructional vigor and artificial grade inflation . . . directly undermine[s] the rights of . . . students [with disabilities]").)  However, Plaintiff's argument suggests a misunderstanding by Plaintiff of the context in which claims under the interference provision of the ADA are brought against employers. *See e.g. Colletta*, 2019 WL 7598666, at *7 ("Plaintiff alleges that [her employer] interfered with her ADA rights."); *see also Robles v. Medisys Health Network, Inc.*, No. 19-cv-6651, 2020 WL 3403191, at *13 (E.D.N.Y. June 19, 2020) (same).  Furthermore, Plaintiff's argument, absent any supporting factual allegations linking Defendants' conduct to the students' exercise of their rights under the ADA, is far too attenuated to support a claim for interference under the ADA.  For these reasons, Plaintiff has not sufficiently pleaded a claim for retaliation under the ADA.

### B.      Retaliation

To establish a prima facie case of retaliation under the ADA, a plaintiff must establish that "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against

plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002) (citation omitted).

### i.    Protected Activity

Under the ADA, "the term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination, and may take the form of either formal or informal complaints." *Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 267 (E.D.N.Y. 2015) (first citing *Chan v. Donahoe*, 63 F. Supp. 3d 271, 295 (E.D.N.Y. 2014) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)); and then *Vil Villavicencio v. Gure-Perez*, 56 F. Supp. 3d 178, 187 (E.D.N.Y. 2014)).  Defendants argue that Plaintiff fails to identify the protected activity that he allegedly engaged in.  (Defs.' Mem. at 5.)  The Court disagrees.

In support of Plaintiff's claim for retaliation under the ADA, Plaintiff argues that he protested the educational discrimination of students with disabilities in the District.  *(See* Am. Compl. ¶ 188 ("I voiced my objections regarding the defendants' strategy of class bifurcation, segregation, modified instructional vigor, and artificial grade inflation because such strategies directly undermine the rights of students with disabilities not to be discriminated against, and to be treated equally, and to receive an 'appropriately ambitious' free and appropriate education").)  It is well-established that advocacy on behalf of the rights of the disabled is protected activity under the ADA.  *See, e.g.*, *Weixel*, 287 F.3d at 149 (holding that a parent's application for reasonable accommodation for her disabled school-aged daughter was protected activity under the ADA).  Furthermore, a teacher who advocates on behalf of their students with disabilities or protests discrimination perpetrated against them has engaged in protected activity.  *Governale v. Cold Spring Harbor Central School District*, No. 14-CV-2689, 2017 WL 4357337, at *6

(E.D.N.Y. Sept. 29, 2017) (finding the complaints of a special education teacher about inadequate services being provided to special education students constituted protected activity under the ADA); *Brooks v. Capistrano Unified School Dist.*, 1 F. Supp. 3. 1029, 1036 (C.D. Ca. Feb. 20, 2014) (finding that a special education teacher's complaints about the lack of individualized occupational therapy for several students with disabilities qualifies was protected activity); *Polonsky–Britt v. Yuba City Unified Sch. Dist.*, No. 2:10–cv–02951, 2012 WL 5828513, at *4 (E.D. Cal. Nov. 15, 2012) ("Advocating for [students with disabilities] on issues related to their federal and state educational rights is a protected activity." (citation omitted)).

Defendants argue that Plaintiff's complaint was self-serving and based on his own personal grievances with the "District's plan to mitigate academic challenges posed by remote instruction due to the COVID-19 pandemic" and its impact on his teaching.  (Defs.' Mem. at 6.) However, Defendants' argument wholly ignores Plaintiff's expressed rationale for his grievances—that is, protest of Defendants' actions, which he believed "undermine[d] the rights of [his students with disabilities]" to be free from discrimination, receive equal treatment, and receive appropriate education.  (*Id.* ¶ 188.)  Since Plaintiff's complaints to the District's administrators and BOE can properly be categorized as advocacy on behalf of his students with disabilities and in protest of discrimination against them, Plaintiff has adequately established that he engaged in engagement in protected activity.

### ii.    Adverse Employment Action

Defendants argue that Plaintiff did not suffer an adverse employment action.  (Defs.' Mem. at 7-9).  The Court reaches the same conclusion.  A plaintiff who brings a claim for retaliation under the ADA must show that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." *Vale v. Great Neck Water Pollution Control Dist.*, 80 F.Supp.3d 426, 440 (E.D.N.Y. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006)); *Orellana v. Farmingdale School District*, No. 20-cv-06050, 2022 WL 976811, at *7 (E.D.N.Y. Mar. 4, 2022) ("In the context of retaliation claims [under the ADA], a materially adverse action is one that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" (citation omitted)) (internal citation omitted); *Gahfi v. New York City Dep't of Educ.*, No. 23-CV-1782 (BMC), 2025 WL 675933, at *12 (E.D.N.Y. Feb. 28, 2025) ("An adverse employment action in the context of a retaliation claim 'covers a broader range of conduct than does the adverse-action standard for claims of discrimination,' and is therefore 'not limited to discriminatory actions that affect the terms and conditions of employment.'" (citation omitted)).

Here, Plaintiff complains that he suffered an adverse employment action when Defendants' changed his teaching assignment from an Integrated Class of mathematics to a "non-Regents" special mathematics class and four academic support periods of smaller class sizes.  (Am. Compl.  ¶¶ 82-84.)  However, courts in this Circuit have generally held that "an unfavorable [work] assignment or teaching schedule" does not rise to the level of an action that could well dissuade a reasonable teacher from making or supporting a complaint of discrimination.  *See Connolly v. City of New York*, No. 16-CV-465, 2022 WL 5553843, at *12 (E.D.N.Y. Aug. 18, 2020) ("[A]n unfavorable office assignment or teaching schedule . . . 'are not materially adverse actions in the retaliation context.'" (citing *Klein v. N.Y. Univ.*, 786 F. Supp. 2d 830, 848 (S.D.N.Y. 2011))).  The refusal to provide an employee with their preferred teaching assignment is not a retaliatory adverse action.  *See Mills v. S. Conn. State Univ.*, 519 F. Appx. 73, 76 (2d Cir. 2013) (finding that refusals to allow plaintiff to teach upper-level courses did not

constitute adverse actions in support of plaintiff's retaliation claim). As such, Plaintiff's re-assignment to non-preferable courses does not rise to the level of retaliatory adverse action.

### iii.    Causal Connection

Even if Plaintiff had sufficiently pleaded adverse employment action, Plaintiff fails to establish a causal connection to support his retaliation claim. To establish a causal connection between the protected activity and the adverse employment action, a plaintiff must prove "that retaliation was a 'but-for' cause of the adverse action." *Pediford-Aziz v. City of New York*, 170 F. Supp. 3d 480, 486 (E.D.N.Y. Mar. 17, 2016) (quoting *Zann Kwan v. Andalex Grp. LLC,* 737 F.3d 834, 845 (2d Cir. 2013)). Here, Plaintiff has not proven that retaliation was necessarily the but-for cause of the employer's action. To put it another way, Plaintiff has not demonstrated that, had Defendants not retaliated against him for vocalizing his complaints, his teaching assignment would not have otherwise been modified as it was. In fact, the Complaint cuts against a finding that retaliation was a but-for cause of the adverse employment action. The Complaint mentions that, before Plaintiff's engagement in the protected activity began in March 2022, Plaintiff experienced a teaching re-assignment in or around 2009, before Plaintiff's engagement in the protected activity began in March 2022 (Am. Compl. ¶¶ 50, 57-58), when his teaching assignment changed from "Regents" Algebra in a Special Class to "Regents" Algebra and/or geometry in an Integrated Class. (*See id.* ¶¶ 12, 14.)

Defendants argue that, because there exists a lack of temporal proximity between the two events, Plaintiff fails to establish causation between the protected activity and the alleged adverse employment action. (Defs.' Mem. at 10–11.) To show causation through temporal proximity alone, courts in the Second Circuit have generally held that a passage of more than two months between the protected activity and the adverse employment action do not allow for an inference

11

of causation.  See *Dodd v. City Univ. of N.Y.*, 489 F. Supp. 3d 219, 247 (S.D.N.Y. 2020); *Marinacci v. U.S. Postal Serv.*, 403 F. Supp. 3d 116, 131 (E.D.N.Y. 2017) (finding a nearly five-month gap between the protected activity and plaintiff's termination "simply too attenuated to support an inference of causation").  However, "the Second Circuit has not defined a 'bright line' setting the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship."  *Orellana*, No. 20CV06050JMAST, 2022 WL 976811, at *8.  Here, the Complaint does not specify the dates of certain events.  (Am. Compl.)  The Court therefore cannot determine whether Plaintiff could establish causation through temporal proximity alone.  Critically, the Complaint does not specify the date on which Defendant Herr informed Plaintiff of his teaching re-assignment, only that the conversation occurred "as the 2022-2023 academic year was winding down." (Am. Compl.  ¶¶ 80-83.)  Nevertheless, as the Court explained above, Plaintiff has not established adverse employment action to support a claim of retaliation.  For these reasons, Plaintiff has failed to establish a prima facie case of retaliation under the ADA.

### 2.  Violation of Section 504 of the Rehabilitation Act

Plaintiff brings a claim against Defendants for interference and/or retaliation in violation of the Section 504 of the Rehabilitation Act.  (Am. Compl. ¶¶ 191-195).  Section 504 of the Rehabilitation Act does not have a provision on interference.  *See* 29 U.S.C. § 794.  Therefore, Plaintiff's claim for interference under Section 504 of the Rehabilitation Act fails to state a claim.  The Rehabilitation Act does, however, protect against retaliation.  *Id.*  As Defendants correctly state, retaliation claims under the Rehabilitation Act and ADA are governed by the same standards.  (Defs.' Mem. at 13.); *Weixel*, 287 F.3d at 148–49.  Since a plaintiff who brings a claim under the Rehabilitation Act has the same burden of proof as that under the ADA, the same analysis applies to both claims.  *Id.* at 148 ("[T]he elements of a retaliation claim under

either Section 504 or the ADA are "(i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." (citation omitted)); *see also Natofsky v. City of New York*, 921 F. 3d 337, 345 (2d Cir. 2019) ("Congress amended the Rehabilitation Act in 1992 to add a provision which states that '[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination ... shall be the standards applied under title I of the Americans with Disabilities Act of 1990.'" (alterations in original) (quoting 29 U.S.C. § 794(d))). Since the Court found that Plaintiff failed to sufficiently plead a claim of retaliation under the ADA, Plaintiff has necessarily failed to establish a prima facie case of retaliation under the Rehabilitation Act.

### 3. 42 U.S.C. § 1983

Section 1983 provides a cause of action for damages to a person whose federal rights were violated by state or local officials. *See* 42 U.S.C. § 1983. "The conduct at issue 'must have been committed by a person acting under color of state law' and 'must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'" *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). "A state employee acting in his official capacity is acting 'under color of state law.'" *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 88 (2d Cir. 2015). Furthermore, public school employees who have input into personnel decisions also act "under color of state law." *Boncoeur v. Haverstraw-Stony Point Cent. Sch. Dist.*, No. 20-cv-10923, 2022 WL 845770, at *5 (S.D.N.Y. Mar. 22, 2022) ("Plaintiff alleges . . . [that] employees of the [s]chool [d]istrict acted under color of state law.' The Court agrees."). Plaintiff asserts a § 1983

claim based on alleged violations of his First Amendment right.  (*See* Am. Compl. ¶¶ 203-211.)

Defendants argue that "[P]laintiff's First Amendment Retaliation claim fails as a matter of law as

his speech was made as a public employee on matters directly related to his professional duties."

(Defs.' Mem. at 14).  For the reasons state below, the Court finds that Plaintiff has failed to plead

a § 1983 claim based on alleged violations of his First Amendment right.[4]

### A.  First Amendment Claim

Plaintiff alleges that, by retaliating against him for "speaking out against the[ir] practices

that were of clear and significant public concern," Defendants violated his First Amendment

right.  (Am. Compl. ¶ 207.)  Specifically, Plaintiff alleges that "[D]efendants retaliated against

[him] for engaging in such protected speech."  (*Id.* ¶ 208.)  Defendants argue that Plaintiff's First

Amendment claim "fails as a matter of law [because] his speech was made as a public employee

on matters directly related to his professional duties."  (Defs.' Mem. at 14.)  The Court agrees

with Defendants' argument.

To recover on a First Amendment retaliation claim under § 1983, a plaintiff must

demonstrate that "(1) [his] speech or conduct was protected by the First Amendment; (2) the

defendant took an adverse action against [him]; and (3) there was a causal connection between

---

[4] Defendants raise the argument that the doctrine of qualified immunity shields the Individual Defendants from liability.  (Defs.' Mem. at 16–17.)  The Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).  The doctrine of qualified immunity shields public officers "from liability for damages unless their conduct violates clearly established constitutional rights of which a reasonable person would have known, or unless it was objectively unreasonable for them to believe that their acts did not violate those rights." *Gomez v. Pellicone*, 986 F. Supp. 220, 226 (S.D.N.Y. 1997) (internal citations omitted).  Public officers are protected by qualified immunity even if "officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context." *Walczyk v. Rio,* 496 F.3d 139, 154 (2d Cir. 2007) (citation and internal quotation marks omitted).  The Second Circuit applies a two-pronged analysis to claims of qualified immunity: firstly, "whether the facts shown 'make out a violation of a constitutional right,'" and secondly, "'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (citation omitted).  Here, the Court has found in its analysis of Plaintiff's § 1983 claim that Plaintiff has not established that Defendants violated his constitutional rights.  This factor is vital to the analysis of claims of qualified immunity.  For these reasons, the defense of qualified immunity is not applicable here.

this adverse action and the protected speech. *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 94 (2d Cir. 2020). The case of *Manigaulte v. C.W. Post of Long Island University* is instructive here as to the question of whether Plaintiff engaged in protected speech under the First Amendment. 659 F. Supp. 2d 367 (E.D.N.Y. 2009). In *Manigaulte*, a former professor alleged that the university retaliated against him after he raised concerns with his supervisors as to the discriminatory effects of classroom practices and certain programs on students with disabilities. *Id.* at 379. The court in *Manigaulte* held that Plaintiff's complaints on behalf of his students with disabilities were made in his official duty as an educator and not as a citizen on a matter of public concern and, therefore, were not protected speech under the First Amendment. *Id.* The First Amendment protects certain speech made by "citizen[s] on a matter of public concern." *Id.* (internal quotation marks omitted) (citing *Garcetti v. Ceballos,* 547 U.S. 410, 418 (2006)). It is clear that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* (internal quotation marks omitted) (citing *Garcetti,* 547 U.S. at 421). "Specifically, teachers who complain to their superiors on behalf of students are speaking in their official duties as educators and the complaints are not protected speech." *Id.* (first citing *Woodlock v. Orange Ulster B.O.C.E.S.,* 281 Fed.Appx. 66, 68 (2d Cir. 2008); then *Felton v. Katonah Lewisboro Sch. Dist.*, 2009 WL 2223853, at *6 (S.D.N.Y. July 27, 2009); and then *Rodriguez v. International Leadership Charter Sch.*, 2009 WL 860622, at *3 (S.D.N.Y. Mar. 30, 2009)). Similarly, in *Woodlock v. Orange Ulster B.O.C.E.S,* the Second Circuit held that the complaints of a special education teacher about the lack of course offerings for students with disabilities "were made pursuant to her 'official duties'" to include "monitoring her students' behavior, needs, and progress*." 281

15

Fed.Appx. 66, 68 (2d Cir. 2008). The *Woodlock* court even characterized plaintiff's complaints to her superiors as "perform[ance] [of] the tasks she was paid to perform" as opposed to an exercise of freedom of speech. *Id.* (citation and internal quotation marks omitted). Therefore, Plaintiff's grievances regarding the "class bifurcation, segregation, modified instructional vigor[,] and artificial grade inflation" within the District do not amount to protected speech under the First Amendment. (Am. Compl. ¶ 206.) Having dismissed Plaintiff's federal claims, the Court declines to exercise jurisdiction over Plaintiff's state law claims.[5]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED and Plaintiff's amended complaint is DISMISSED in its entirety. The Clerk of Court is respectfully directed to close this case.

SO ORDERED.

Dated: Brooklyn, New York
     September 30, 2025

/s/ LDH              
LaSHANN DeARCY HALL
United States District Judge

---

[5] Plaintiff also brings claims for violations of Section 740 of New York Labor Law (Am. Compl. ¶¶ 178-185), Section 51 of Municipal Tax Payer Action (*Id*. ¶¶ 196-202), Section 75-B of New York Civil Service Law (*Id*. ¶¶ 212-215) under New York state law. "Where a court dismisses all claims over which it has original jurisdiction, it may, in its discretion, decline to exercise supplemental jurisdiction over remaining claims." *Wolfinger v. Consolidated Edison Co. of New York, Inc.*, No. 17-CV-1710, 2018 WL 3637964, at *12 (E.D.N.Y. July 31, 2018) (citing 42 U.S.C. § 1367(c)(3)); *see also Klein & Co. Futures. Inc. v. Bd. of Trade*, 464 F.3d 255, 262 (2d Cir. 2006) ("[W]here, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims.").

16